**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **FIRST STATE ORTHOPAEDICS,** | : | **CIVIL ACTION** |
| **ROY LERMAN, M.D. and** | : | |
| **all others similarly situated** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CONCENTRA, INC., CONCENTRA** | : | |
| **MANAGED CARE, INC. and FOCUS** | : | |
| **HEALTHCARE MANAGEMENT, INC.** | : | **NO.  05-4951** |


**MEMORANDUM AND ORDER**

Norma L. Shapiro, S.J.                                      October 16, 2007

Plaintiffs, First State Orthopaedics ("First State") and Roy Lerman, M.D., brought this

action for breach of contract and other contractual claims, individually and on behalf of all other

similarly-situated providers of medical services.  Plaintiffs and defendants, Concentra, Inc.,

Concentra Managed Care, Inc. and Focus Healthcare Management Inc., and their parents,

affiliates, and subsidiaries (collectively "Concentra"), have entered into a stipulation to settle this

action.  The parties jointly seek final approval of the class action settlement agreement, and

plaintiffs' counsel requests an award of attorneys' fees and expenses.

The court has jurisdiction pursuant to 28 U.S.C. §1332(d), because there is diversity of

citizenship between a named plaintiff and a named defendant and the amount in controversy

exceeds $5,000,000, exclusive of interest and costs.  See Compl. at ¶10.  Venue is proper in this

district under 28 U.S.C §1391(a) because at least one defendant carries on business within this

district.

For the reasons that follow, the settlement between the plaintiff class and Concentra is

found to be fair, reasonable and adequate and is approved.

## I. BACKGROUND

### A. Factual Background

1. The Parties

a. *Concentra and its Services*.  Concentra is a national provider of medical cost containment and healthcare management services.  Compl. ¶7.  Concentra does not provide medical services directly to patients, Id., and it has no statutory or contractual obligation to pay the providers of medical services.  Fairness Hr'g. Tr. 52, 80.  It functions solely as an intermediary between those who provide direct medical services to patients and the companies that pay the medical bills submitted by such providers.  Concentra's role is limited to making payment recommendations to its payor clients; the payor clients are contractually free to ignore Concentra's recommendations.  Id. at 52.

Concentra's payor clients generally service the workers' compensation and automobile claims insurance markets.  Concentra provides two types of relevant services to those clients. First, it provides a bill review program, including a computerized review of medical bills that health care or medical providers submit to the payors for payment.  Second, Concentra's wholly-owned subsidiary, Focus Healthcare Management, Inc., provides the organization and marketing of a Preferred Provider Organization "(PPO") network (the "Focus PPO").  See Compl. ¶¶1-38.

b. *Plaintiffs.*

Plaintiffs, First State Orthopaedics ("First State") and Roy Lerman, M.D., are health care providers suing individually and on behalf of a class of similarly situated health care providers. First State's claims against Concentra relate to its bill review program.  First State contends

Concentra has made inappropriate payment recommendations since 1995 to the payors of provider bills.[1]

Dr. Lerman is a primary care physician who practices medicine in King of Prussia, Pennsylvania and has been a member of the Focus network since 2000.  Dr. Lerman contests the PPO discounts taken by Concentra's payor clients in the payment of his bills.  Compl. ¶6.

2.  Plaintiffs' Claims.

Plaintiffs' complaint alleges causes of action against Concentra based upon breach of contract/duty of good faith and fair dealing, tortious interference with existing and prospective contractual relations and unjust enrichment.  Plaintiffs seek as damages the difference between the amount they were paid by Concentra's payor clients and the amounts they would have been paid absent any reduction to their bills, as well as injunctive relief.  A trial by jury was demanded.  Id. at ¶¶ 12-17.

Plaintiffs allege Concentra engaged in two, distinct wrongful courses of conduct related to the services. One relates to its bill review program; the second involves its PPO practices.

a.  *The Bill Review Claims*.

At issue is Concentra's practice of "arbitrarily and unilaterally recommending to payors of medical claims that they reduce medical expense claims filed by the class for medical services rendered to individuals insured by payor clients of Concentra.  As a result of its improper reductions, Concentra's clients have failed to pay the provider class the full amount of their

---

[1]Plaintiff First State is not pursuing PPO claims because it is not a member of the Focus PPO network, although Michael Pushkarewicz, M.D., one of First State's shareholders, is a former member of the Focus PPO network.   Compl. ¶5.

reasonable medical expenses billed." Compl. ¶1.  There are two separate components to the bill review claims.

First State initially challenges the rates recommended by Concentra to its payor clients. Insurance companies throughout the country have adopted the practice of reducing medical providers' bills to a "usual and customary rate" ("UCR").  In order to facilitate this practice, payors utilize a third party database to obtain access to provider charges.  Concentra offers its payor clients access to such a UCR database known as the MDR Payment System; Concentra purchased the MDR Payment System from a third party vendor, Ingenix, Inc.  Comp. ¶¶21-25; Jt. Pre-Hearing Memorandum ("Jt. Memo")[2] at 3.  In processing bills, Concentra has supplemented this database by a second Ingenix product called PowerTrak, which Concentra uses to process bills.  Jt. Memo at 3.   These products are widely used in the medical bill review industry.  Id.; Test. of David Young, Joint Exhibits of Settling Parties ("Jt. Ex."), Ex. 5, Tr. at 12.  First State claims the Ingenix products are manipulated by Ingenix through certain "faulty and corrupt" statistical methods.  Compl. ¶ 38.  It is alleged that Concentra recommends reductions to its payor clients in an "arbitrary and capricious manner" based on this "flawed database of alleged provider charges", so that its clients pay providers less than the UCR rates those clients should pay.  Compl. ¶33.  First State contends the charges recommended by Concentra have nothing to do with the actual UCR rates charged by providers but are "solely designed to increase the profits of Defendant's Payor clients and to earn Defendants fees."  Compl. ¶34.

Second, First State alleges Concentra utilizes an arbitrary and capricious bill review system to determine the validity of provider charges and engages in a standard practice of

_____

[2]Docket entry # 88.

-4-

manipulating computer codes to reduce provider billing submissions.  Allegedly after arbitrarily downcoding, Concentra recommends to its payor clients that claims be paid without reasonable investigation.  Compl. ¶¶55, 58.

For both these bill review claims, Concentra allegedly issues deceptive Explanations of Review ("EOR"s) not adequately explaining the basis for recommended payment reductions. Compl. ¶¶35, 55.

Concentra vigorously disputes the existence of any bias or flaw in its bill review program. It further argues that Concentra could only be liable for flawed results arising from a third party software program if plaintiffs could prove Concentra knowingly used the flawed system and was a joint tortfeasor with its payor clients as part of a conspiracy to defraud the providers.

b. *The PPO Claims*

In general, PPOs manage health care before medical treatment is rendered.  Most PPOs act as a contracting entity and form separate contractual relationships with both healthcare providers and payors.  A provider who contracts with a PPO agrees to become a "preferred provider" in the PPO network and accept discounted rates in exchange for anticipated increased patient volume.  A PPO typically has separate agreements with payors, who agree to steer plan participants to the preferred providers, by providing various incentives.  Compl. ¶¶13-14. Methods for increasing patient volume are commonly called "steerage".  Fairness Hr'g Tr. at 32.

Concentra maintains a PPO network called "Focus", providing physicians with access to payor covered insureds primarily with workers' compensation and automobile accident claims. Dr. Lerman contends that, in exchange for joining in the Focus PPO and agreeing to accept discounted payments, he and other providers expected to receive an increased volume of patients

that did not materialize.  Lerman claims Concentra "frustrated the legitimate expectations" of the providers by not creating incentives to induce patients to use the Focus PPO providers; instead, Concentra caused the providers to be paid at discounted rates, without providing the consideration contemplated.  Plaintiff additionally charges that not all provider PPO contracts stated that the providers were joining a PPO for workers' compensation and automobile accident claims, with deeper discounts than regular group health claims.  Compl. ¶¶14-29; Jt. Memo at 4.

      3.  <u>Prior Litigation History</u>.

Similar actions have been filed against Concentra in other jurisdictions.  This other litigation is relevant to determining the fairness of the settlement in this action.

According to plaintiffs, a state court action was filed in August 2000 on behalf of Dr. Michael J. Pushkarewicz, also the owner of First State, against Concentra and other defendants for claims similar to those alleged in this complaint.[3]  Discovery was conducted, and the court ultimately enforced an arbitration clause between plaintiff and the payor defendant.  During the pendency of the arbitration, the claims against Concentra were held in abeyance.  Plaintiff's claim against the payor was ultimately settled.  By the time of that settlement, Pushkarewicz Orthopaedics Associates, Inc. was no longer an operating entity; therefore, plaintiff's counsel, also counsel in this action, informed the court it did not wish to pursue any claims against Concentra.  This federal court action was filed by Dr. Pushkarewicz's current practice, First State, and it represents a continuation of the Doctor's efforts to halt the objectionable practices claimed in his prior Pennsylvania state court action.  <u>See</u> "Unopposed Motion for Preliminary

———————————————

    [3]<u>Pushkarewicz Orthopaedics Associates, Inc. v. Devon Health Services, Inc., et al.</u>, No 001606, C. C. P., Philadelphia County.

Approval" ("Prelim. App. Mtn.") at 7-11.[4]

Plaintiffs' counsel, Kenneth Gogel, has been involved in five other individual and class actions against Concentra and its payor clients during the past 10 years, each with allegations similar to those in this action.[5]  According to plaintiffs' counsel, extensive discovery was conducted in the previous lawsuits: thirty-four depositions were taken, including ten depositions of key employees of Concentra and senior claims managers from nine of Concentra's clients; Concentra produced 3,200 pages of documents.  Prelim. App. Mtn. at 10.

Plaintiffs' counsel has encountered little success in its claims against Concentra.  In most cases the claims were dismissed, partially dismissed or class certification was denied;  Concentra paid nominal damages in two other cases.  See Prelim. App. Mtn. at 7-11; Jt. Memo at 30.

In February 2005, medical providers in Illinois filed two class actions against Concentra with claims similar to those here.[6]  A class settlement in this action would terminate these two cases.  Id.  Plaintiffs' counsel in the Illinois lawsuits represent several of the objectors to the settlement in this action.

### B.  Procedural Background

---

[4]Docket entry #9.

[5]Southeast Physical Therapy Services, Inc.v. Healthcare Value Management, Inc. et al., No. 98-3546, Suffolk County, Massachusetts; New England Physical Therapy Network, P.C. et al. v. Healthcare Value Management, Inc. et al. No 98-06143, Middlesex County, Massachusetts; Syed M. Sayeed, M.D. v. Trust Insurance Co., et al., No 9733 CV 1398, New Bedford District Court, Massachusetts; Joseph R. Mitzan, et al., v. MedView Services, Inc. et al., C.A. No 98-01211, Norfolk County, Massachusetts; MVA Rehabilitation Associates v. Trust Insurance Co., et al., Civil Action No. 99-00235, Hampden County, Massachusetts.

[6]Richard C. Coy, D.C. et al. v. Focus Healthcare Management Inc., No. 05-349-DRH, U.S. Dist. Ct., S.D. Ill.; Patrick B. Komeshak, el al. v. Concentra Inc., No. 05-CV-261-DRH, U.S. Dist. Ct., S.D. Ill.

1. <u>The Settlement Agreement</u>

Plaintiffs' initial complaint was filed on September 16, 2005, and an amended complaint was filed on April 21, 2006.   The First Amended Stipulation of Settlement (the "Settlement Agreement") was also filed on April 21, 2006.[7]

The proposed settlement consists entirely of prospective injunctive relief, with no monetary payments to the plaintiff class.  In exchange for a release of claims, Concentra has committed to change the disclosure and business practices challenged in this action.  The Settlement Agreement obligates Concentra to do the following over a four year period:

(1) Devote at least $2 million improving the accuracy of its Bill Review program by implementing a company-wide quality assurance program and creating verification reports that can be used by Concentra's payor clients;  Concentra will do this by increasing its quality assurance staff, who will analyze samples of all data entry and coding determinations; Concentra will also initiate incentive programs promoting accurate input and review of these bills;

(2) provide internal confirmation of third-party relative actual charge data used to derive UCR rates for provider charges;

(3) create a website providing more transparency to its Bill Review operations, including sources of fee schedules, procedure coding edits and other information;

(4) not automatically downcode evaluation or management claims;

(5) reject instructions from its payor clients to discount automatically certain services without verification from other sources;

---

[7]The First Amended Stipulation of Settlement is set forth in its entirety in Ex. 1 to Document #47.

(6) provide a sufficiently-funded forum to medical providers for internal dispute resolution;

(7) invest in initiatives to increase steerage to participating PPO providers.  For example, Concentra will train its payor clients in effective steerage methods relating to workers' compensation-related injuries; Concentra will also conduct direct mailings to insureds of payors with potential automobile injury claims;

(8) make additional disclosures to providers that Concentra does not guarantee steerage of insureds of payors clients; that providers can terminate their participation in the PPO network with written notice; and that Concentra will furnish providers with a copy of the provider contract upon written request and a more detailed EOR.

The release does not include any class claims that Concentra "violated a state regulatory scheme that specifically regulates workers' compensation or automobile injury preferred provider organizations."  Nor does the release include any claims the class may have against Concentra's payor clients.  See Settlement Agreement, §1(ee), definition of "Released Claims".

The Settlement Class was defined by the Settlement Agreement as follows:

(I)      all Providers: (a) whose Bills for services provided to a person covered by a workers' compensation program or Automobile Accident Policy were submitted to the Defendants' Bill Review Program; (b) the Defendants' Bill Review Program repriced the Provider's Bills at less than the face amount of the Bills; © the Payors paid Providers an amount less than the face amount of the Bills; and (d) the date of medical service was between January 1, 1995 and the Preliminary Approval Order, as defined below; and

(ii)     all current Participating Providers as of the date of this Settlement Agreement who: (a) submitted Bills for services provided to a person covered by a workers' compensation program or Automobile Accident Policy and received or were tendered a payment less than the face amount of the Bills, based on a discount resulting from the Participating Provider's membership in Defendants' Preferred Provider Organizations; and (b) the date of medical service was between January 1, 1995 and the Preliminary

Approval Order, as defined below.

Excluded from this Settlement Class are:

(1)    Defendants, their respective present and former, direct and
       indirect, parents, subsidiaries, divisions, partners,
       employees and affiliates;

(2)    the United States government, its officers, agents, agencies
       and departments;

(3)    former members of Defendants' PPO Networks who were not
       Participating Providers as of the date of the Agreement are
       excluded from the Class with respect to any claims arising out of
       their membership in the Defendants' PPO Networks; and

(4)    all persons who have timely elected to opt out of or exclude
       themselves from the Settlement Class in accordance with the
       Court's Orders.

The Settlement Agreement also provided for plaintiffs' counsel to receive attorneys' fees

up to $425,000 and expense reimbursement up to $15,000.  Settlement Agreement, ¶33.

 2.  Preliminary Approval

On April 27, 2006, after a preliminary fairness hearing, the court preliminarily approved

the settlement.  By Order entered after the preliminary hearing[8], plaintiffs' counsel was appointed

to act as class counsel to represent the settlement class, and Hilsoft Notifications ("Hilsoft") was

appointed as the settlement administrator.  Concentra was directed to provide class counsel with

names and addresses of all providers who may fall within the definition of the settlement class,

and Hilsoft was directed to mail a court approved notice to all such providers.  Notice was also

ordered published in *USA Today,* the *Journal of the American Medical Association* and *Medical*

---

[8]Docket entry #53.

*Economics*.   Hilsoft was directed to maintain a website from which the Settlement Agreement

and the notice could be downloaded.  A deadline for opting out of the settlement class was set for

September 12, 2006.

      3.  <u>Notice to Class and Response</u>

      Hilsoft is a nationally-recognized company specializing in designing and implementing

legal notification plans; it has served as the notice administrator in hundreds of federal and state

court class actions.  <u>See</u> Report of the Settlement Administrator, Jt. Memo, Ex. B (the "Hilsoft

Report").  According to the Hilsoft Report, on May 1, 2006, notices were sent by certified mail to

53 Attorneys General and 31 state officials with primary regulatory or supervisory responsibility

over Concentra's business.[9]  On June 12, 2006, a summary notice, the form of which had been

approved by the court, was mailed to the addresses of known class members.  The notice stated:

> This lawsuit has two claims and is limited to medical services provided for people
> insured under a worker's compensation program or an automobile accident policy.
> The lawsuit alleges that the Defendants made recommendations to insurers and
> other payors of medical claims to reduce payments to medical providers based on
> biased re-pricing software or improperly calculated usual, customary and
> reasonable ("UCR") charges....The lawsuit also claims that Defendants sold PPO
> preferred provider lists along with the agreed-upon discount rate for that PPO
> network without the knowledge of the providers and that through the Focus or
> MetraComp PPO network, did not take the necessary steps to provide proper
> referrals, channeling, or steerage under contractual agreements with providers in
> those networks.  Defendants deny that these allegations are true or that they did
> anything wrong.

      The notice also described Concentra's business, its bill review program and its PPO.  It

outlined the settlement benefits in detail and expressly informed the class that no monetary

payment would be made.  The class was advised how to opt out of the class or object to the

---

[9]This notice was issued in accordance with the provisions of §1715 of the Class Action
Fairness Act of 2005.

settlement.  The notice was mailed to each member of the class in accordance with the court's preliminary approval order.   Hilsoft also established an information website from which more detailed information regarding the settlement could be downloaded.   The detailed notice was mailed to anyone who requested it.

According to the Hilsoft Report, the summary notice was mailed to 761,435 addresses. Of these, 102,307 were returned as undeliverable, and attempts were made to remail to new addresses, where known.  Overall mailings reached approximately 86.8% of the potential class. Hilsoft Report at 16.  As of the date of the fairness hearing, Hilsoft had received 1,087 valid requests for exclusion, or 0.16% of the total delivered notices.  Affidavit of Todd Hilsee dated October 19, 2006.[10]

4.  Discovery

As noted, extensive discovery was conducted by plaintiffs' counsel in previous related litigation.  In addition, prior to filing the Amended Stipulation of Settlement, plaintiffs deposed three senior executives at Concentra.  Concentra also provided discovery to the Illinois Objectors: responses to interrogatories, documents and data on the bill review claims.  See Letter of Michael Kendall, Esquire, dated Sept. 14, 2006.[11]  Concentra's counsel submitted a list of over 15,000 pages of written discovery provided to the Illinois Objectors in previous actions.  Id.

5.  Objectors

Objections to the proposed settlement were filed by the following parties: Shore

---

[10]Exhibit 1 to attached Order.  This number includes Dr. Craig Little, who opted out in person at the fairness hearing.  See Hilsee Affidavit, ¶5, Fairness Hr'g. Tr. at 17.

[11]Exhibit 2 to attached Order.

Orthopaedics, David Duhon, Calcasieu Spinal Center, Rogers Park Surgery Center, and Drs. David Dameron, Richard Coy and Thomas Kaltenbronn.  Dr. Coy is the named plaintiff in a separate class action filed in federal court in Illinois.  (Drs. Coy and Kaltenbronn and Rogers Park Surgery Center are collectively referred to as the "Illinois Objectors").

The objectors contend the settlement is unfair primarily because it provides only for prospective relief, with no monetary damage award.  They also argue the settlement was collusive and plaintiffs are inadequate representatives of the class.  Dameron Obj.[12]; Ill. Objectors' Obj.[13]

6. <u>Fairness Hearing</u>

A fairness hearing was held after the opt-out period expired.  Only the Illinois Objectors and Dr. Dameron were present and/or represented by counsel at this hearing.  Fairness Hr'g. Tr. at 23.  There was testimony from several witnesses, with full cross-examination by the objectors who were present.  Three volumes of exhibits were produced and admitted into evidence.  Oral argument was presented by counsel for the plaintiffs, Concentra and the objectors.

## II.  CERTIFICATION OF SETTLEMENT CLASS.

Rule 23 of the Federal Rules of Civil procedure governs the certification of class actions. To be certified, a class must satisfy the four threshold requirements of Federal Rule of Civil Procedure 23(a):  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative

---

[12]Docket entries #40 and #50.

[13]Docket entry #82.

parties will fairly and adequately protect the interests of the class.  Fed.R.Civ.P. 23(a); In Re

Warfarin Sodium Antitrust Litigation, 391 F.3d 516, 527 (3d Cir. 2004).  In addition, the parties

seeking certification must show the action is maintainable under Rule 23(b)(1), (2) or (3).

Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997).  Rule 23(b)(3), the category at

issue here, allows for so-called "opt-out" class actions.  Id. at 614-615.  Under Rule 23(b)(3), two

additional requirements must be met in order for a class to be certified: (1) common questions

must "predominate over any questions affecting only individual members" (the "predominance

requirement"); and (2) class resolution must be "superior to other available methods for the fair

and efficient adjudication of the controversy" (the "superiority" requirement).  Warfarin, 391

F.3d at 527.  Class certification requirements must be met even in the settlement context, except

that the court "need not inquire whether the case, if tried, would present intractable management

problems...for the proposal is that there be no trial."  Amchem, 521 U.S. at 620.

A.  Numerosity

This settlement class is so numerous – over 660,000 notices were sent to provider class

members – that joinder of all members is clearly impracticable.  The numerosity requirement of

Rule 23(a)(1) is easily satisfied.   See Eisenberg v. Gagnon, 766 F.2d 770, 785-86 (3d Cir.), cert.

denied, 474 U.S. 946 (1985) (90 class members meet numerosity requirement).

B.  Commonality and Predominance

Rule 23(a)(2)'s commonality element requires that the proposed class members share at

least one question of fact or law in common with each other.  Rule 23(b)(3)'s predominance

element requires that common issues predominate over issues affecting only individual class

members.  Our Court of Appeals has noted that the two factors should be analyzed together, with

-14-

a particular focus on the predominance requirement.  In Re Warfarin, 391 F.3d at 528.

Plaintiffs have alleged that Concentra engaged in two separate courses of misconduct, the bill review scheme and the PPO scheme, both of which reduced payments made to the provider class.  Concentra utilized these objectionable practices on a nationwide basis, and all putative class members would have been affected in the same manner.  These allegations raise several questions of law and fact common to the entire class, such as whether the bill review practices were arbitrary, whether there was sufficient steerage for the PPO contracts, and whether Concentra colluded with Ingenix or the payors.  Proof of Concentra's liability on these issues would depend on evidence common to the class.

The objectors have challenged whether the commonality and predominance elements are satisfied.  They claim that variations in state law, particularly as they relate to workers' compensation claims, render the proposed settlement unsuitable for class certification and disposition.  The Illinois Objectors claim Illinois law is more favorable to the plaintiff class than Pennsylvania law, because Illinois recognizes a statutory fraud right of action against bill review vendors and precludes the operation of a workers compensation PPO unless a panel of physicians is established.  Ill. Obj., Paragraph VIII.[14]  This objection is without merit.[15]  Variations in rights and remedies available to injured class members under state law do not defeat commonality and

_____

[14]This alleged lack of commonality did not preclude the Illinois Objectors from seeking to certify a nationwide class in Illinois.  See Fairness Hr'g. Tr. at 164.

[15]It is doubtful whether a provider would have a claim against Concentra's PPO for violating Illinois law.  820 Ill. Comp. Stat. §305/8 permits an employer to post a panel of physicians at the workplace as a means of directing injured workers to in-network providers, but nothing in the statute conditions taking PPO discounts for workers' compensation on the existence of such a panel.

predominance.  A finding of commonality "does not require that all class members share

identical claims."  <u>Warfarin</u>, 391 F.3d at 530, quoting <u>In Re Prudential Ins. Co. of Am. Sales</u>

<u>Practices Litig.</u>, 148 F. 3d 283, 310 (3d Cir. 1998).   A single common question may be sufficient

to satisfy the requirements of Rule 23(a)(2).  <u>See</u> <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir.

1994).  Where, as here, Concentra engaged in standardized conduct, arguably giving rise to

contractual claims by the class, the commonality and predominance requirements of Rule 23 are

satisfied.  <u>Warfarin</u>, 391 F.3d at 528; <u>Prudential</u>, 148 F. 3d at 310.

    C. <u>Typicality</u>

    Typicality must be evaluated in "common-sense terms"; the issue is whether "the

incentives of the plaintiffs are aligned with those of the class . . . .  Factual differences will not

render a claim atypical if the claim arises from the same event or practice or course of conduct

that gives rise to the claims of the class members, and if it is based on the same legal theory."

<u>Beck v. Maximus</u>, 457 F.3d 291, 296 (3d Cir. 2006).  In <u>Beck</u>, the Court of Appeals found that

the typicality element had not been satisfied where the proposed class representative was subject

to a unique defense likely to become a major focus of the litigation.  <u>Id.</u> at 301.

    Here, no defenses have been asserted against either First State or Dr. Lerman that would

ultimately become the focus of the litigation. Their position is substantially similar to that of

every other class member.  They are medical providers who submitted bills to third party payors

for whom Concentra provided the services challenged in this lawsuit.  Their claims arise out of

Concentra's system-wide business practices allegedly resulting in reduced payments to all class

members.  Because of the similarity of the underlying claims, plaintiffs can reasonably be

expected to advance the interests of all class members, and the typicality requirement of Rule 23

is met.

    D. <u>Adequate Representation</u>

A representative plaintiff must be able to provide fair and adequate protection for the interests of the class.  The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." <u>Beck v. Maximus</u>, 457 F.3d at 296, quoting <u>Amchem</u>, 521 U.S. at 625.  It "assures that the named plaintiff's claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." <u>Beck</u>, 457 F.3d at 296, quoting <u>Baby Neal</u>, 43 F.3d at 55.

The first inquiry in assessing adequate representation is whether the named plaintiffs' claims are antagonistic to the class.  One conflict cited by the objectors relates to the proposed compensatory payments for the named plaintiffs, but these payments are common in class action settlements and do not render the representatives inadequate if based on services rendered in the class action. <u>See</u>, <u>e.g.</u>, <u>Nichols v. SmithKline Beecham Corp.</u>, 2005 U.S. Dist. LEXUS 706, at *80 (E.D. Pa. Apr. 22, 2005).  Another alleged conflict is between current and former members of the Focus PPO. <u>See</u> Dameron Obj. at p. 4.  However, the interests of the former PPO members do not "tug against the interests" of the current members by virtue of this settlement. <u>Amchem,</u> 521 U.S. at 626.  This situation is distinguishable from those involving a monetary settlement fund, where more money for current PPO members must mean less money for former members. <u>Cf</u>. <u>id</u>. at 626-627 (disapproving asbestos settlement because of the possibility that settlement fund could be exhausted before class members with future illnesses were eligible for payment).  The settlement calls instead for system-wide changes that will benefit current and

-17-

future PPO members as well as any provider subject to bill review.  The court is not persuaded

that any true conflicts between named plaintiffs and other class members are present.

The second adequacy inquiry is whether class counsel has the requisite experience to

represent the class.  According to his affidavit, Kenneth Gogel, lead counsel for the class, has

been practicing in the areas of complex litigation and class actions for over 20 years.  He has

been admitted to practice with local counsel in approximately twenty states and in federal courts

nationwide.  He has also been involved in numerous class actions, including litigation of claims

against various participants in the managed care industry.  Plaintiffs' Counsel's Application for

Fees, Ex. A.[16]   Class co-counsel is a former City Solicitor for the City of Philadelphia who has

represented clients in various complex litigation and business matters.  Id., Ex. B.  A third local

counsel is similarly experienced in class actions and Multi-District Litigation, including

consumer fraud and breach of contract actions.  Id., Ex. C.   The Court finds  class counsel to be

sufficiently experienced and well-qualified to prosecute the claims on behalf of the entire class.

Many of the objections to the settlement challenge the adequacy of class representation.

The objectors argue that class counsel are inadequate because they have not sufficiently

investigated the claims, since no state consumer fraud claims have been asserted.   Ill. Obj. ¶IV.

While certain states may have favorable statutes covering such claims, there is considerable

variation in state statutory fraud laws.  Cf. Balderston v. Medtronic Sofamor Danek, Inc., 285

F.3d 238 (3d Cir. 2002) (Pennsylvania's Unfair Trade Practices and Consumer Protection Law

not applicable to physician who purchased surgical screws for business rather than personal

purposes).  The statutes of limitations and other defenses vary with each state, and such statutory

---

[16]Docket entry # 95.

fraud claims are difficult to maintain as nationwide class actions.  See Avery v. State Farm Mut.
Auto. Ins. Co., 835 N.E. 2d 801, 853-55 (Ill. 2005) (reversing certification of nationwide class
for Illinois Consumer Fraud Act claims).  It is a legitimate tactical decision to avoid these issues
and the attendant risk of decertification.   The fact that some members of the class may have
additional state or federal law claims, not asserted by the named plaintiffs, does not preclude a
class from being certified.  The Settlement Agreement does not release any claims for violation
of a state regulatory scheme regulating workers compensation or automobile injury preferred
provider organizations, nor does it release any claims a class member may have against any
payor.

In the most troublesome objection, the objectors also claim class counsel are inadequate because they have not prevailed in
any prior litigation against Concentra. Ill. Obj., ¶VI.  This may have more to do with the
difficulty of establishing legal liability against a third party claims administrator than any
inadequacy or incompetence of the class counsel.

In the most troublesome objection, the objectors contend the settlement is collusive
because it was negotiated at an early stage of the litigation.[17]  An inquiry into collusion is
relevant when assessing adequacy of the representation in a class action settlement.  See  In Re
Community Bank, 418 F.3d 277, 307-308 (3d Cir. 2005).  In Community Bank, the Court of
Appeals found the district court had not adequately scrutinized a settlement in view of several
factors, including the lack of any formal discovery, the potential for collusion, and the existence

---

[17]The objectors contend that First State did not enter into an attorney-client relationship
with class counsel prior to the start of settlement discussions.  This contention was vigorously
contested by the lead class counsel, who asserted he had represented First State since 2004, well
before the complaint was filed in September 2005.  Fairness Hr'g Tr. at 118.

of an extremely expedited settlement of questionable value accompanied by an "enormous"[18]

legal fee. The Court remanded the final settlement approval, with the direction that the district

court more carefully consider several issues, particularly the adequacy of class representation.

The timing of the settlement in this action is similar to that in Community Bank, but

there are several critical distinctions between this settlement and the one at issue in Community

Bank. In Community Bank, there were meritorious claims under two federal statutes that named

plaintiffs had not asserted in the complaint because of the statute of limitations bar; other

members of the class retained these causes of action. Here, the only unasserted claims referenced

by the objectors arise under state consumer fraud statutes; unlike the waived federal statutory

claims in Community Bank, applicable to all class members, these state fraud statutes would vary

with each jurisdiction. Any class member who believed his claim was stronger under such a

statute had the opportunity to opt out, as did several of the objectors from Illinois.

In Community Bank, "no formal discovery was conducted whatsoever." Id., 418 F.3d at

307. In this action, plaintiffs took depositions of three senior executives of Concentra, and

numerous documents were provided by Concentra to plaintiff and the objectors. See Jt. Ex. 3, 4

5; Kendall Letter. There was also voluminous discovery taken over the course of 10 years in

related litigation. Prelim. App. Mtn. at 10. The objectors were permitted to introduce evidence

and cross-examine witnesses at the fairness hearing. Unlike Community Bank, plaintiffs'

counsel are not waiving any rights on behalf of the class without full awareness of the merits of

the case.

Finally, Community Bank, unlike this action, involved "an enormous class-action fee,"

_____

[18]Community Bank, 418 F.3d at 308.

Id. at 308 (fee of $8.1 million requested).  The Court of Appeals noted the "special danger of collusiveness when the attorney fees, ostensibly stemming from a separate agreement, were negotiated simultaneously with the settlement."  Id. at 308.  Although the fees here were negotiated as part of the Settlement Agreement, the requested award of $425,000 for three firms, is far from "enormous" by class action standards; this low fee request substantially reduces the incentive of plaintiffs' counsel to collude with the defendants.  Cf. Gen. Motors, 55 F.3d at 803 (agreement for $9.5 million in fees deemed suspect when suit was settled four months after filing).

After several months of observing counsel at various proceedings and after reviewing the entire record, the court is satisfied that plaintiffs and defendants, each represented by counsel with a reputation for integrity and considerable experience in complex commercial matters, were intimately familiar with the strengths and weaknesses of their respective actions.  In view of their prior litigation experience with Concentra, plaintiffs' counsel had a strong appreciation for the factual and legal deficiencies of this action, in particular the problem of proving liability against a third-party administrator with no contractual obligation to pay claims to medical providers.  Although troubled by the timing of the settlement relatively soon after the complaint was filed, the court is satisfied that this settlement was negotiated at arms-length in good faith, no collusion occurred, and plaintiffs were adequate representatives of the class for purposes of Fed.R.Civ.P. 23(a).

E.  <u>Superiority</u>

The "superiority" requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.  This action involves a large number of plaintiffs, with nearly 680,000 notices mailed.  The claims against defendants allege systemic problems with Concentra's bill review and PPO systems.   Even if liability were assumed, a large damage award is not likely in favor of any single medical provider.   A medical provider would have little interest in individually controlling the prosecution or defense of a separate action, because each provider has a very small claim in relation to the cost of prosecuting a lawsuit as to his or her individual bills.  The class action format spreads the litigation costs among numerous injured parties and encourages system-wide improvements to the Concentra's bill review and PPO practices.  It is a superior vehicle for asserting these claims.  <u>See</u> <u>Warfarin</u>, 391 F.3d at 534.

F.  <u>Adequacy of Notice</u>

Counsel for Dr. David Dameron, an objector to the settlement, argued at the fairness hearing that the form of notice did not satisfy the specificity requirements of Fed.R.Civ.P. 23(c)(2)(B) because it failed to mention a claim for breach of contract or the four counts of the complaint.  Fairness Hr'g. Tr. at 8-10.  The notice mailed to the class specifies the two essential claims in the case: arbitrary re-pricing of UCRs and non-compliance with PPO arrangements. The notice also described Concentra's business, its bill review program and its PPO.  It described the settlement benefits in detail and informed the class what steps to take to opt out of the class. This was concise and clear enough for a provider to understand: the nature of the action; the

definition of the class certified; the class claims, issue or defenses;[19] the class member's right to

appear through counsel; the opt-out provisions; and the binding effect of a class judgment.

Publications were made in media with national circulation and the case garnered national

attention within the medical community.   Moreover, if the potential class members desired more

---

[19]After the notice in this case was disseminated, our Court of Appeals articulated the standards for class certification orders.  The Third Circuit requires such orders, or the opinions supporting them, to include:  (1) a readily discernible, clear and precise statement of the parameters defining the class to be certified, and (2) a readily discernible, clear and complete list of the claims, issue or defenses to be treated on a class basis.  Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 187-88 (3d Cir. 2006).  This requirement of Rule 23(c)(1)(b) would appear to apply equally to a stipulated class settlement.  See Amchem, 521 U.S. at 620; In Re Elec. Carbon Prod. Antitrust Litig., 447 F.Supp. 389, 395 (D. N.J. 2006).

The claims, issues and defenses to be treated on a class basis in this action include:  (1) all Released Claims, as defined in the Settlement Agreement; (2) whether Concentra's bill review program has inappropriately recommended reductions to class members' bills payable under a workers' compensation program or automobile accident policy; (3) whether the bill review program (for workers' compensation or automobile accident claims) is, or has been, based on biased arbitrary or capricious information; (4) whether the bill review program (for workers' compensation or automobile accident claims) knowingly uses, or has used, data that is inappropriate to determine reimbursement to class members for "reasonable" or UCR rates; (5) whether the bill review program has recommended that payment to class members for medical bills payable by a workers' compensation program or auto accident policy be reduced or denied based on edits that are arbitrary; (6) whether Concentra engaged in arbitrary downcoding of the class members' medical bills payable by a workers' compensation program or auto accident policy; (7) whether Concentra's PPOs systematically recommended PPO discounts to providers who have not joined the PPO or agreed to accept discounts for workers' compensation or automobile accident injury claims; (8) whether Concentra is required to perform any particular type or amount of steerage of patients or provide other incentives or benefits to encourage patients to use members of Concentra's PPO networks, in exchange for class members' participation in such networks; (9) whether Concentra provided steerage mechanisms to encourage patients to use members of its PPO networks in accordance with its contracts with medical providers; (10) whether Concentra issued deceptive EORs relating to the medical bills paid pursuant to either a workers' compensation program or an automobile accident policy; and (11) whether Concentra can be subject to damages for any of the alleged misconduct described above.  The claims specifically do not include any claims that Concentra violated any state regulatory scheme regulating workers' compensation or automobile injury claims, preferred provider organizations, or any claims the class may have against any of Concentra's payor clients.

information than was provided in the notice, the full complaint was filed with and available from

the Clerk of Court.  Accordingly, the Court is satisfied that the requirements of Rule 23(c)(2)(B)

and due process were satisfied by the notice in this case.

## III.  FAIRNESS OF SETTLEMENT.

    A.  Standard of Review.

    Federal Rule of Civil Procedure 23(e) provides "[a] class action shall not be dismissed or

compromised without the approval of the court . . . .  The decision of whether to approve a

proposed settlement of a class action is left to the sound discretion of the district court."  Girsh v.

Jepson, 521 F.2d 153, 156 (3d Cir. 1975).  The district court acts "as a fiduciary who must serve

as a guardian of the rights of absent class members . . . .  [T]he court cannot accept a settlement if

the proponents have not shown it to be fair reasonable and adequate."  General Motors, 55 F.3d

at 785 (internal quotations and citations omitted).  Nevertheless, the law favors settlement,

particularly in class actions and other complex cases where substantial judicial resources can be

conserved by avoiding formal litigation.  General Motors, 55 F.3d at 784.

    A district court is to apply an initial presumption of fairness where:  "(1) the settlement

negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of

the settlement are experienced in similar litigation; and (4) only a small fraction of the class

objected."  Cendant, 264 F.3d at 232, n. 18.  The third and fourth prongs of this test are clearly

met here.  Class counsel's experience with this type of litigation is clear, and only 0.16% of the

class opted out or objected to the settlement.  While the objectors have argued the settlement was

not at arms' length and discovery was insufficient, the court has been presented with no

evidence--other than circumstantial evidence regarding timing of the settlement--from which it

-24-

can conclude that the settlement negotiations were not at arm's length.  The court has already

satisfied itself that the adequacy of representation requirement of Rule 23(a) was met; part of this

determination was based on the voluminous discovery produced in related litigation by plaintiffs

represented by plaintiffs' counsel against Concentra over the past 10 years and the confirmatory

discovery in this action.  The court finds that the third and fourth prongs of the presumption of

fairness test have been met, and the settlement should be presumed fair.   Warfarin, 391 F.3d at

535.  However, this is a rebuttable presumption, and the Court is mindful of its obligation to be

"even more scrupulous than usual . . . to ensure that class counsel has engaged in sustained

advocacy throughout the course of the proceedings, particularly in settlement negotiations, and

has protected the interests of all class members." Id. at 534.

      B.  Objections

The Illinois Objectors argue the settlement is unfair because: (1) it was collusive; (2) the

prospective relief, with no award of monetary damages, is inadequate; (3) the notice to the class

was insufficient and misleading; (4) the scope of the relief is overly broad because it releases

monetary damage claims, including statutory fraud claims (5) membership in the class may not

be discernable; (6) class counsel and class plaintiff are inadequate; (7) a national settlement is not

warranted; (8) certain subclasses should have been designated; and (9) no injunction is provided

to ensure enforcement.  Ill. Objectors' Obj.[20]  Dr. Dameron's objections are similar.  Obj. of

AMA and Zechariah C. Dameron.[21]   These objections are addressed in light of the fairness

factors set forth in Girsh v. Jepson, 521 F.2d at 157.

---

[20]Docket entry #82.

[21]Docket entries #40 and #50.

C.  The *Girsh* Factors.

Our Court of Appeals has outlined nine factors a district court should consider in assessing the fairness, adequacy and reasonableness of a class action settlement,  Girsh, 521 F.2d at 157:  (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceeding and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range or reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

### 1.  Complexity, Expense and Likely Duration of the Litigation

This first factor "captures the probable costs, in both time and money, of continued litigation."  Warfarin, 391 F.3d at 535-36, quoting Cendant, 264 F.3d at 233.  In a class action of this magnitude, with nearly 700,000 class members, the time and expense leading up to trial and on appeal would be enormous.  The class would have to face the expense and delays of extensive discovery and pretrial motions.  It would be a complex jury trial involving highly technical issues of fact and law relating to the health care industry in general and the workers' compensation and automobile claims insurance industry in particular.  Post-trial motions and appeals would further prolong the litigation and would significantly reduce the value of any monetary recovery to the class.  Warfarin, 391 F. 3d at 536.  In the meantime, even if ultimately successful, the class members would be required to wait for an extended period of time for Concentra to take any actions to redress the alleged deficiencies in its bill review and

PPO programs.  Of course, any recovery or benefit to the class members is by no means assured.

Thus, the first Girsh factor weights heavily in favor of settlement.

### 2.  Reaction of the Class to the Settlement

The second Girsh factor "attempts to gauge whether members of the class support

the settlement."  Warfarin, 391 F.3d at 536, quoting Prudential, 148 F.3d at 318.  The notice in

this case was widely disseminated, both by mailed summary of the litigation and by placement in

national publications.  Nevertheless, only 0.16% of the plaintiff class who were notified of this

proposed settlement chose to opt out.  Only seven persons or entities objected, and several of

them had mixed motives for doing so.[22]  Although a small number of objectors is not dispositive,

see General Motors, 55 F.3d at 812, the provider class members are not unsophisticated

consumers likely to be confused by the claims or the settlement procedures; all class members

are physicians with advanced educational degrees who are capable of assessing the value of their

individual claims and whether to opt out of a settlement providing no monetary relief.

Based on the class reaction to the settlement, it can be inferred that an overwhelming

majority of the provider class favors a settlement calling for Concentra to cease its objectionable

business practices rather than one that will be delayed over the course of several years before any

monetary relief could possibly be granted.  In such circumstances, the second Girsh factor weighs

in favor of settlement.

### 3.  Stage of the Proceeding and Amount of Discovery Completed

The third Girsh factor "captures the degree of case development that class counsel

_____

[22]Counsel for the Illinois Objectors are pursuing other lawsuits that will be foreclosed by this settlement.

[had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." Warfarin, 391 F.3d at 537 (quotation and citation omitted).   Based on the voluminous discovery produced in substantially similar litigation involving the same plaintiffs' counsel and the same defendant, together with the confirmatory discovery taken in this action, the court is fully persuaded that class counsel had a keen appreciation for the action's merits and weaknesses.  Additional discovery would not have substantially enhanced counsel's understanding of the plaintiffs' class claims, but would have significantly delayed implementation of any relief to the plaintiff class. This factor weighs in favor of settlement.

### 4. and 5.  Risks of Establishing Liability and Damages

These Girsh factors recognize consideration of the potential risks and rewards of proceeding with the litigation to weigh the likelihood of eventual greater success against the benefits of an immediate settlement.  Warfarin, 391 F.3d at 537 (citations omitted).  The significant obstacles faced by the class in establishing liability and damages are highly relevant to a determination of fairness of this settlement.

The initial hurdles to establishing Concentra's liability are factual in nature.  To establish liability for the bill review claim, plaintiffs would have to prove flaws with the bill review system; this would involve highly technical, complex questions of fact.  Plaintiffs then would have to establish that Concentra was responsible for those flaws.  This would present a particularly difficult problem of proof because Ingenix, an unrelated third party, not Concentra, developed the allegedly "flawed and corrupt" database.  Fairness Hr'g. Tr. at 77.  Concentra does not even edit the Ingenix database.  Jt. Ex. 4., Tr. at 37.

-28-

With regard to the PPO steerage claims, plaintiffs would have to show a contractual obligation by Concentra to guarantee a certain amount of steerage to the preferred provider class. Not only were there no such guarantees in the PPO contracts, the contracts imposed no requirements of Concentra whatsoever with regard to steerage.  <u>See</u> Fairness Hr'g. Tr. at 33, 51; Jt. Ex. 3, Tr. at 21, 23; Jt. Ex. 3-3.

Plaintiffs and the objectors have contended that Concentra operates a "silent PPO" by taking discounts for something not referred to on a patient's identification card, without giving any form of steerage to the provider.  Fairness Hr'g. Tr. at 124.  Every participating doctor had a written contract with the Focus PPO, and no physician would be subjected to discounts in the Focus Network without a written contract.  Jt. Ex. 3, Tr. 13.  Concentra sends EORs informing a doctor of a patient's status in the network.  Fairness Hr'g. Tr. at 142-143.  With these contractual disclosures, it would be difficult to prove that the PPO was "silent".

Concentra could assert the arbitration clauses contained in the PPO contracts as a defense. <u>Id.</u> at 37, 41.  Even if this defense were unsuccessful, it would have the effect of delaying relief to the class.

The legal basis for liability is also questionable.  The class claims are grounded in contract law, but Concentra is not the payor of medical bills to the class providers, and it has no contractual obligation with the providers to make such payments.  This contractual obligation remains with Concentra's payor clients.  Concentra merely makes recommendations to its payor clients; payors do not have to follow Concentra's recommendations.  <u>Id.</u> at 51.  This absence of a contractual relationship with Concentra could be fatal to the breach of contract class claims.

Successful assertion of a claim for tortious interference with contractual relations requires

a plaintiff to prove: (1) the existence of a contractual or prospective contractual relation between the plaintiff and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of a privilege or justification on the part of defendant; and (4) actual legal damage as the result of the defendant's conduct.  Blackwell v. Eskin, 916 A.2d 1123, 1127-28 (Pa. Super. Ct. 2007).  The plaintiff class has contractual relationships with the payors, but it would be difficult to show that Concentra's actions in reviewing bills or taking PPO discounts was specifically intended to harm those contractual relations or, indeed, that any harm to those relations resulted from Concentra's actions.

The third substantive claim in the complaint, unjust enrichment, does not require a specific contract between the parties,  Limbach Co., LLC v. City of Phila., 905 A.2d 567, 575 (Pa. Cmwlth. 2006), so there might be liability on the bill review claim.  But an unjust enrichment claim requires proof of "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  Lackner v. Glosser, 892 A.2d 21, 34 (Pa. Super. Ct. 2006).   Because there is no privity between Concentra and the providers with respect to bill review, this claim would be similarly difficult to prove.

To establish liability in the absence of a contractual relationship or privity, plaintiffs would have to establish that Concentra engaged in a fraudulent conspiracy[23] with Ingenix and/or

---

[23]Concentra is arguably the agent of its payor clients in recommending bills for payment. A corporation cannot conspire with its agent unless the agent acts beyond the scope of its authority or for its own benefit.  Cf. Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125

the payor clients to defraud the medical provider class.  The objectors have suggested that

Concentra's conduct was, in fact, fraudulent.  Fairness Hr'g. Tr. at 160.  To prove fraud,

plaintiffs would be required to show:  "(1) misrepresentation of a material fact; (2) scienter; (3)

intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon

the misrepresentation; and (5) damage to the defrauded party as a proximate result."  Colaizzi v.

Beck, 895 A.2d 36, 39 (Pa. Super. Ct. 2006).  This proof must be by evidence that is "clear,

precise and convincing."  Snell v. Commonwealth, 416 A.2d 468, 470 (Pa. 1980).  No evidence

showing fraud has been produced.  Fairness Hr'g Tr. at 160.

　　　　Class counsel's experience in prior litigation against Concentra underscores the

impediments to obtaining any recovery of monetary damages against Concentra.   In the five

previous cases, motions for complete or partial dismissal were granted in three cases, class

certification was denied in one and two were settled by very minor sums paid by Concentra.

Prelim. App. Mtn. at 7-10.  The AMA has been litigating against the parent of Ingenix for over

six years over bill review issues, with little apparent success.  Fairness Hr'g. Tr. at 161.

　　　　 Because of the significant difficulties the plaintiff class would face in establishing

liability and damages, the fourth and fifth Girsh factors weigh heavily in favor of the fairness of

this settlement.

### 6.  Risks of Maintaining Class Action Through Trial

　　　　This Girsh factor measures the likelihood of maintaining class certification if the action

were to proceed to trial.  Warfarin, 391 F.3d at 537.  Although this settlement class was found

---

(3d Cir. 1995) (corporation and agent incapable of antitrust conspiracy where economic interest
and purpose intertwined and agent did not act for personal reasons).   This principle would
present yet another legal hurdle for the plaintiff class.

appropriate for certification, there is some risk that such a nationwide class of providers "would create intractable management problems if it were to become a litigation class, and therefore be decertified." Id.  This is especially true in light of the arbitration clauses contained in the PPO agreements, some of which allegedly contain limitations on damages and penalties.  Jt. Memo in Support of Prelim. Approval at 5.[24]  These variations might ultimately result in the exclusion of those providers.  This risk of decertification weighs in favor of settlement.  Warfarin at 537.

### 7.  Ability of Defendant to Withstand Greater Judgment

The court takes judicial notice[25] of Concentra's Annual Report on Form 10-K for the fiscal year ended December 31, 2005, filed with the Securities and Exchange Commission on March 29, 2006, in the Concentra parent company discloses annual revenues in excess of $1 billion.  The objectors argue that $36 million of insurance money might also have been available to pay these claims.  Fairness Hr'g Tr. at 68.

The prospective relief offered here is not without cost to Concentra.  It avers the implementation of the settlement agreement's terms will cost $3.7 million.  It also contends the gross revenues of lines of business affected by this settlement are only $47.6 million, and the net profits are only $23 million, Fairness Hr'g. Tr. at 44, but Concentra clearly could withstand a greater judgment against it.  This Girsh factor weighs against the fairness of the settlement proposed here.

### 8. and 9.   Range of Reasonableness of Settlement in Light of Best Possible Recovery and all Attendant Risks of Litigation

---

[24]Docket entry #39.

[25]Fed.R.Evid. 201(b)(2).

The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. Warfarin, 391 F.3d at 538. The primary objection to the settlement is that it offers no monetary compensation to the plaintiff class. Ill. Obj., ¶II; Dameron Obj. at 5. The absence of money damages does not necessarily mean the settlement is unreasonable or unfair.

      a. Benefits to Class

Concentra has undertaken to invest in initiatives to improve quality assurance for its bill review program. These include addition of 9-12 employees over its current staffing level and the creation of incentive programs to promote accurate input and review by bill review employees. It will analyze its bill review database to ensure its reimbursement rates are representative and will inform the payor clients of discrepancies. Concentra will make available sources of fee schedules, procedure coding edits and other information by establishing a website and will implement a dispute resolution process for provider billing disputes. It will also invest in initiatives designed to improve the clarity of its EORs. Settlement Agreement, §10; Jt. Ex. 3-5. These actions will cost Concentra over $2 million. Jt. Memo at 16.

With respect to the PPO claims, Concentra will invest in initiatives to increase steerage to participating providers. This will include the assignment of two new employees dedicated to steerage efforts together with enhanced disclosures to participating providers. Franklin B. Stevens of Navigant Consulting, Inc., plaintiffs' expert with over twenty-two years experience in the healthcare business, estimated the value of the PPO settlement initiatives as at least $68 million. Jt. Ex.1-4. Based on conservative estimates of increased network penetration attributable to the proposed improved steerage efforts, he stated these results "are reasonable and

achievable based on . . . the increased resources that Concentra will dedicate to steerage." Id. at
3.

Testimony at the fairness hearing credibly established that these proposed changes in
Concentra's business practices are the result of this proposed settlement and that the changes
would not have been undertaken but for this lawsuit and its settlement.  See Fairness Hr'g. Tr.:
Testimony, Ian Gordon, Chief Operating Officer for Concentra CNS Division, Tr. at 29-30, 56;
Testimony, David Young, Senior Vice President, Chief Operating Officer CNS Workers' Comp
Division, Tr. at 78.

> b.  Non-Monetary Relief

Despite the difficulties they pose to measurement, nonpecuniary benefits may
support a class action settlement.  Bolger v. Bell Atlantic Corp., 2 F.3d 1304, 1311 (3d Cir.
1993).  Courts evaluating such settlements need to be particularly cautious about collusion and
concealment, particularly where large attorneys' fee awards are proposed.  See Bolger, 2 F.3d at
1319; General Motors, 55 F.3d at 778 (rejecting settlement where each class member would
receive a $1,000 coupon towards a new truck but attorneys requested fees of $9.5 million).
However, the absence of monetary relief does not automatically render a settlement unfair.
Bolger, 2 F.3d at 311; see also Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105 (E.D. Pa. 2005);
Ikon Office Solutions, Inc. Sec. Litig., 209 F.R.D. 94 (E.D. Pa. 2002); Sommers v. Abraham
Lincoln Fed. Sav. & Loan Ass'n, 79 F.R.D. 571 (E.D. Pa. 1978).

In Bolger, a derivative suit against a corporate defendant was settled by an agreement
mandating certain structural changes in defendant's corporate governance; the proposed
structural changes addressed the essence of plaintiffs' grievances.  The Court of Appeals,

although cautious because the relief was entirely nonpecuniary, found no abuse of discretion where the probability of plaintiffs' success on the merits was uncertain, few shareholders objected and discovery had been completed.

In Ikon, the district court approved settlement of an ERISA class action that afforded no monetary award to plaintiffs but prescribed structural changes to the challenged benefit plan. The court noted several reasons that a non-cash settlement was appropriate:  there was a significant threat of a legal bar to any recovery of monetary relief; expert advice attributed substantial and concrete monetary value to the relief afforded by the settlement; and the facts were distinguishable from the General Motors settlement the Court of Appeals found inadequate.

This action involves some of the considerations found in Ikon.  The plaintiff class faces substantial obstacles to establishing liability for money damages.  This is a legitimate consideration of counsel when assessing the appropriateness of a non-cash settlement.  Ikon, 209 F.R.D. at 108.  Reliable expert evidence of Franklin B. Stevens quantifies a significant prospective benefit to the class.  The circumstances of this settlement are distinguishable from those found suspect in General Motors, 55 F.3d at 863.  In General Motors, the settlement was comprised of restricted coupons which were "essentially worthless" to many class members and were deemed "in reality, a sophisticated marketing program" benefitting the defendant, Id. at 807, together with a contemplated $9.5 million attorneys' fee award, Id. at 803-804, a factor not present here.

While the nonmonetary relief mandates increased scrutiny of the settlement, the court is persuaded that the settlement cures many of the objectionable practices complained of by the plaintiffs and provides real benefits to the class despite the absence of any monetary payment.  It

is a good value for a relatively weak case.  See <u>Warfarin</u> at 538.


    D.  <u>Remaining Objections</u>.

The objectors contend membership in the class may not be discernable to a class member because the EORs do not explain that Concentra is involved in the bill review process and membership in the Focus network is not always clear.  However, the increased disclosure initiatives to be provided by Concentra with the settlement agreement are adequate to address this concern.  <u>See</u> Settlement Agreement, §10.

The objectors further contend there should have been subclasses for the UCR and the PPO claims, with separate counsel and separate settlements.  Such a procedure would not be conducive to judicial economy and should not be undertaken unless there are conflicts between the two groups; there are no apparent conflicts here requiring separate representation.

While it is true that no injunction is provided to ensure enforcement, plaintiffs would be able to bring an action to enforce the terms of the settlement; this court would retain jurisdiction to hear such a complaint.  The order accompanying this opinion will clarify the court's continuing enforcement authority.

    E.  <u>Conclusion of Fairness</u>

After considering each of the requisite factors under <u>Girsh v. Jepson</u>, the court concludes that eight of the nine factors weigh in favor of settlement, and the presumption of fairness has not been rebutted.  The question here is not whether the proposed settlement embodies the best possible recovery for the plaintiffs.  Rather, the issue is whether the settlement, in light of all the risks, costs and delays of litigation, is "fair, reasonable and adequate" to the plaintiff class.

Fed.R.Civ.P. 23(e).   After reviewing the evidence submitted, the objections to the settlement, and the considerations set forth in <u>Girsh</u>, the court concludes this settlement is fair, reasonable and adequate and should be approved.

## IV.  MOTION TO DISQUALIFY CLASS REPRESENTATIVE AND CLASS COUNSEL.

Two weeks after the conclusion of the fairness hearing, the Illinois Objectors moved to disqualify the class representatives and class counsel on the basis of their fee petition.  In the initial fee petition, First State and Dr. Lerman each claimed entitlement to $2,000 as compensatory payments for time expended on the matter.  The court requested substantiation for these amounts, and Dr. Lerman subsequently submitted an affidavit that he spent 2.5 hours on this action; this entitles him to a compensation award of only $1,000.  The Illinois Objectors contend Dr. Lerman's initial claim was improperly inflated so that he should be disqualified. Plaintiffs' counsel persuasively responds that when the fee petition was submitted, it was anticipated that Dr. Lerman would need to appear at the fairness hearings, so the petition covered actual and anticipated expenditures of his time.  When Dr. Lerman did not testify at the hearing, the actual time he expended was less than originally anticipated.  This is a sufficient explanation for the initial submission, and Dr. Lerman will not be disqualified on this ground.

The Illinois Objectors claim the payment to Dr. Lerman highlights the conflict between him and the class since he is the only one receiving any monetary payment.  Such a compensatory payment is lawful, <u>See</u>, <u>e.g.</u>, <u>Nichols v. SmithKline Beecham Corp.</u>, 2005 U.S. Dist. LEXUS 706, at *80 (E.D. Pa. Apr. 22, 2005), and a physician is not likely to be motivated for devious purposes by a payment of $2,000.

The Illinois Objectors also contend that Dr. Lerman's spending only 2.5 hours on the

action demonstrates he is not a suitable representative.  This argument might be more compelling if Dr. Lerman's counsel had no prior experience litigating this type of claim.  Plaintiffs' counsel has spent 10 years litigating substantially similar claims against Concentra and could easily apprise Dr. Lerman of the relevant issues during the stated time period.  The issue of adequacy of representation has already been discussed and the Court is satisfied that the absent class members have been adequately represented.  The Illinois Objectors' Motion to Disqualify the Class Representatives and Class Counsel will be denied.

## V.  ATTORNEYS' FEES AND EXPENSES

Class counsel requests that the court award attorneys' fees in the amount of $425,000 and expenses of $6,070.63.  In addition, a compensatory payment of $2,000 is requested for each named plaintiff.

A.  Attorneys' Fees.

A thorough judicial review of fee applications is required in all class action settlements. General Motors, 55 F.3d at 819.  In determining the fee award, our Court of Appeals follows the percentage-of-the-recovery method.  See Cendant, 243 F.3d at 734.  Several non-exclusive factors are considered in determining the appropriate percentage fee: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.  Gunter v. Ridgewood Energy Corp. 223 F.3d 190, 195, n.1 (3d Cir. 2000).  See also Prudential, 148 F.3d at 339.

The complex legal and factual issues and procedural difficulties of this nationwide class action have been described.  As a result of their efforts, the attorneys obtained substantial benefit to the class: Concentra is required to expend $3.7 million to implement the terms of the settlement; the initiatives are worth a conservatively estimated $68 million to the class.  There were no objections to the fee award made by any party, even though the fee was explicitly set forth in the class notice.  The attorneys involved were highly skilled and devoted a significant amount of time to the case.

The fee award is no greater than the fees awarded in similar class actions.  The fee application seeks 11.5% of the value of the $3.7 million settlement, a figure well below the norm.[26]  See Cendant, 243 F.3d at 736 (fee awards range from 19% to 45%).  Many courts have considered 25% to be the benchmark figure for attorney fee awards in class action lawsuits, with adjustments up or down for case-specific factors,  Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 262 (D.Del. 2002), aff'd, Warfarin, 391 F.3d at 516, and awards above this percentage amount are common.  See, e.g., Godshall v. Franklin Mint Co., No. 01-6539, 2004 WL 2745890 at *6 (E.D. Pa. Dec. 1, 2004) (33% approved); In re FAO Inc. Sec. Litig., No 03-942, 2005 WL 3801469 at *25 (E.D. Pa. 2005) (33% approved); see also AT&T Corp. Sec. Litig., 455 F.3d 160 (3d Cir. 2006) (21.25% award approved).  The 11.5% percentage-of-recovery award is a reasonable attorneys' fee in the circumstances of this settlement.

The Court of Appeals requires the district court to cross-check the percentage award

---

[26]Plaintiffs' counsel suggests the requested figure is actually only 10.5% of the recovery, but this calculation assumes the recovery fund includes the attorneys' fees and expenses of $425,000 plus $15,000 for expenses set forth in the Settlement Agreement. There is an element of double-dipping if attorneys' fees and expenses are included in calculating the settlement value for purposes of determining and reducing the percentage award; this approach will not be used.

against the "lodestar" award to ensure the reasonableness of the fee.  <u>Gunter</u>, 223 F. 3d at 195, n.

1.  The lodestar award is calculated by multiplying the number of hours reasonably expended by

a reasonable hourly billing rate for such services based on the given geographical area, the nature

of the services provided, and the attorney's experience.  <u>Id.</u>  The total lodestar for the three firms

working on this case is $224,044.50.  Decl. of Kenneth I. Trujillo, ¶8.  The requested fee is

approximately 1.9 times the lodestar amount.  Lodestar multipliers ranging from one to four are

frequently awarded in common fund cases when the lodestar method is applied.  <u>In Re Cendant</u>,

243 F.3d at 742.  The 1.9 multiple requested here is within reason, <u>See</u> <u>Stop & Shop Supermarket</u>

<u>Co. v. SmithKline Beecham Corp</u>., No 03-4578, 2005 WL 1213926 at *18 (E.D. Pa. May 20,

2005 (15.6 multiplier); <u>In re Rite Aid Corp. Sec. Litig.</u>, 362 F.Supp. 2d 587, 589 (E.D. Pa. 2005)

(6.96 multiplier), and the lodestar cross-check supports the reasonableness of a 11.5%

percentage-of-recovery fee award.

     For these reasons, the petition for attorneys' fees of $425,000 is deemed reasonable and

will be approved.

     B.  <u>Expenses</u>.

     Counsel seeks reimbursement of $6,070.63 for expenses incurred in pursuing this action.

These expenses include copying costs, legal research computer fees, travel costs and expert fees.

After a review of the detailed expense records attached to the petition, the court finds an award of

these expenses fair and reasonable.

     C.  <u>Compensatory Payments</u>

     Federal Rule of Civil Procedure 23 contemplates no special treatment for plaintiffs in

class action suits, and this Court strongly disapproves of excessive awards of "incentive"

payments to named plaintiffs.  In this action, Plaintiffs seek compensatory awards in the amount of $2,000 for their time and effort in pursuing the litigation.  The Settlement Agreement provides that Concentra will pay up to $4,000 for a total of ten hours compensation at the rate of $400 per hour.  Reasonable payments are permissible to compensate named plaintiffs for the expenses they incur during the course of class action litigation.  Nichols v. SmithKline Beecham Corp., 2005 U.S. Dist. LEXUS 706, at *80 (E.D. Pa. Apr. 22, 2005); Godshall v. Franklin Mint, 2004 WL 2745890 at *6.  At the fairness hearing, the Court requested vouchers for all payments.  Both plaintiffs submitted affidavits after the hearing.  Dr. Michael Pushkarewicz's affidavit showed he had spent eight hours advancing the litigation; Dr. Lerman's showed 2.5 hours. These hours are reasonable but will be limited to $400 per hour with a $2,000 cap.  First State/Dr. Pushkarewicz will be awarded $2,000 and Dr. Lerman will be awarded $1,000 to compensate each for services in the litigation.


## VI.   MOTION TO SEAL

The Illinois Objectors moved to file their pre-hearing memorandum under seal.  They claim the memorandum and exhibits rely on confidential financial information supplied by the settling parties through discovery.  The Illinois Objectors had agreed to maintain the confidentiality of the material produced and marked confidential.  The motion is unopposed by the settling parties.

A party seeking a protective order under Fed.R.Civ.P. 26(c) must show "good cause by demonstrating a particular need for protection." Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).  Broad allegations of harm are not enough.  Id.; See also In Re Cendant

<u>Corp.</u>, 260 F.3d 183, 194 (3d Cir. 2001).

The Illinois Objectors' request does not satisfy the requirement for a protective order. References to "confidential financial information" and an agreement to maintain confidentiality do not show harm that would result if the pretrial memorandum were not filed under seal. Accordingly, this motion is denied. Out of respect for the privacy of patient records and to ensure compliance with Health Insurance Portability and Accountability Act, 42 U.S.C. §1320d <u>et</u> <u>seq.</u>, patient names and patient identification numbers shall remain redacted.

## VII.  MOTION IN LIMINE TO EXCLUDE EXPERT REPORT

The Illinois Objectors moved to exclude the report filed by the expert for the plaintiff class, Franklin B. Stevens, on the grounds that it was untimely filed. In the interest of having as complete a record as possible in this complex case, this motion is denied.

## VIII. CONCLUSION

As the court stated at the fairness hearing, "This is not a lawsuit to fight the HMO movement. [D]octors are free to go to Congress and change the national bias in favor of HMOs . . . I don't think . . . this is the place for that fight, and it may be that doctors wish to fight insurance companies over what they pay and that's also a fair fight, but it's not this fight." Fairness Hr'g. Tr. at 100.

This fight is limited to whether the settlement of the class claims against Concentra is fair, reasonable and adequate. After a full review of the record, the court concludes it is.

An appropriate order will issue.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FIRST STATE ORTHOPAEDICS,** | : | **CIVIL ACTION** |
| **ROY LERMAN, M.D. and** | : | |
| **all others similarly situated** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CONCENTRA, INC., CONCENTRA** | : | |
| **MANAGED CARE, INC. and FOCUS** | : | |
| **HEALTHCARE MANAGEMENT, INC.** | : | **NO.  05-4951** |

## JUDGMENT

AND NOW, this ___ day of _____, 2007, for the reasons set forth in the attached Memorandum and Order, the Court finds that:

    a.      All class members have been served with notice of the proposed First Amended Stipulation of Settlement (Ex. 1 to Paper #47) (the Settlement Agreement") and the fairness hearing on October 19, 2006, either directly or by publication in accordance with the court's order of May 1, 2006 directing same.   All capitalized terms herein have the meaning attributed to them in the Settlement Agreement.

    b.      The Mailed Notice, Full Notice, Published Notice and notice methodology implemented pursuant to the settlement (I) constitute the best practicable notice; and (ii) constitute notice that is reasonably calculated, under the circumstances, to apprise members of the Settlement Class of the pendency of the lawsuit, their right to object or exclude themselves from the proposed settlement and to appear at the Final Approval Hearing, and their right to seek monetary and other relief; (iii) are reasonable and constitute due, adequate and sufficient notice to all persons entitled to receive notice; and (iv) meet all applicable requirements of Due Process and Pennsylvania law.  All Settlement Class members were afforded the opportunity to exclude themselves from participation in this action. Notice by mail and publication was the best practicable in the circumstances.

    c.      Class Counsel and plaintiffs adequately represented the Settlement Class for the purpose of entering into and implementing the settlement.

    d.      Attorney's fees and costs awarded to class counsel in the amounts below are reasonable and were adequately documented by counsel.

Therefore,  it is ORDERED that:

1. The Settlement Agreement is fair, reasonable and adequate and in the best interest of the Settlement Class, and plaintiffs and defendants are directed to consummate, implement and perform its terms.   The Settlement Agreement is **APPROVED** in all respects pursuant to Federal Rule of Civil Procedure 23(e) on behalf of the following class (except members who have timely excluded themselves and are listed in Exhibit A):

> (I) All Providers: (a) whose Bills for services provided to a person covered by a workers' compensation program or Automobile Accident Policy were submitted to the Defendants' Bill Review Program; (b) the Defendants' Bill Review Program repriced the Provider's Bills at less than the face amount of the Bills; © the Payors paid Providers an amount less than the face amount of the Bills; and (d) the date of medical service was between January 1, 1995 and the Preliminary Approval Order, as defined below; and

> (ii)  all current Participating Providers as of the date of this Settlement Agreement who: (a) submitted Bills for services provided to a person covered by a workers' compensation program or Automobile Accident Policy and received or were tendered a payment less than the face amount of the Bills, based on a discount resulting from the Participating Provider's membership in Defendants' Preferred Provider Organizations; and (b) the date of medical service was between January 1, 1995 and the Preliminary Approval Order, as defined below.

Excluded from this Settlement Class are the following persons:

> (1)    the Defendants, their respective present and former, direct and indirect, parents, subsidiaries, divisions, partners, employees and affiliates;

> (2)    the United States government, its officers, agents, agencies and departments; and

> (3)    former members of Defendants' PPO Networks who were not Participating Providers as of the date of this Agreement are excluded from the Class with respect to any claims they have arising out of their membership in the Defendants' PPO Networks.

> (4)    all persons who have timely elected to opt out of or exclude themselves from the Settlement Class in accordance with the Court's Orders.

2. The claims, issues and defenses to be treated on a class basis in this action include:  (1) all Released Claims, as defined in the Settlement Agreement; (2) whether defendants' bill review program has inappropriately recommended reductions to class members' bills payable by a

workers' compensation program or automobile accident policy; (3) whether the bill review program (for workers' compensation or automobile accident claims) is, or has been, based on biased arbitrary or capricious information; (4) whether the bill review program (for workers' compensation or automobile accident claims) knowingly uses, or has used, data that is inappropriate to determine reimbursement to class members for "reasonable" or UCR rates; (5) whether the bill review program has recommended that payment to class members for medical bills payable by a workers' compensation program or auto accident policy be reduced or denied based on edits that are arbitrary; (6) whether defendants engaged in arbitrary downcoding of the class members' medical bills payable by a workers' compensation program or auto accident policy; (7) whether defendants' PPOs systematically recommend PPO discounts to providers who have not joined the PPO or agreed to accept discounts for workers' compensation or auto injury claims; (8) whether defendants are required to perform any particular type or amount of steerage of patients or provide other incentives or benefits to encourage patients to use members of defendants's PPO networks, in exchange for class members' participation in such networks; (9) whether defendants provided steerage mechanisms to encourage patients to use members of its PPO networks in accordance with its contracts with medical providers; (10) whether defendants issued deceptive EORs relating to the medical bills paid pursuant to either a workers' compensation program or an automobile accident policy; and (11) whether defendants can be subject to damages for any of the alleged misconduct described above.  The claims specifically do not include any claims that defendants violated a state regulatory scheme regulating workers' compensation or automobile injury preferred provider organizations or any claims the class may have against any of defendants' payor clients.

3.  Plaintiffs and the Settlement Class have conclusively compromised, settled, discharged, dismissed and released any and all Released Claims against the Released Parties. Plaintiffs and all Settlement Class members who have not been excluded from the Settlement Class are barred from filing, commencing, prosecuting, intervening in or participating (as a class member or otherwise) in any lawsuit or administrative, regulatory, arbitration or other proceeding in any jurisdiction based on, relating to or arising out of the Released Claims.

4.  Without affecting the finality of this Order, the Court reserves jurisdiction over defendants, the named plaintiffs and the Settlement Class as to all matters relating to the administration, consummation, enforcement and interpretation of the terms of the Settlement Agreement and this Order and for any other necessary purposes.

5.  Class Counsel are awarded reasonable attorneys fees and costs in the amount of $425,000 ("Attorneys' Fee Award").  The Attorneys' Fee Award will be paid to Class Counsel by the defendants in accordance with the terms of the Settlement Agreement.  The Attorneys' Fee Award shall be paid within 30 days of the Effective Date of the Settlement Agreement.

6.  As compensation for their efforts as the named plaintiffs, First State Orthopaedics is awarded $2,000 and Dr. Roy Lerman is awarded $1,000.  These payments shall be made in accordance with the terms of the Settlement Agreement.

/s/ Norma L. Shapiro

_____

S.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **FIRST STATE ORTHOPAEDICS,** | : | **CIVIL ACTION** |
| **ROY LERMAN, M.D. and** | : | |
| **all others similarly situated** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CONCENTRA, INC., CONCENTRA** | : | |
| **MANAGED CARE, INC. and FOCUS** | : | |
| **HEALTHCARE MANAGEMENT, INC.** | : | **NO.  05-4951** |


AND NOW, this 16th day of October, 2007, for the reasons stated in the attached Memorandum and Opinion, it is **ORDERED** that:

1.  The First Amended Stipulation of Settlement (Ex. 1 to Paper #47 ), preliminarily approved on May 1, 2006, is **APPROVED** as fair, reasonable and adequate.

2.  The objections to the Settlement Agreement are **OVERRULED**.

3.  The Opt-Out List attached hereto as Exhibit 1 is **APPROVED**.  This Opt-Out List is a complete list of all settlement class members who have timely requested exclusion from the settlement class.

4.  Objectors' Motion to File Pre-Hearing Disclosure Memorandum Under Seal (Paper #90) is **DENIED**; provided, however, that all patient names and patient identification numbers in such memorandum shall remain redacted.

5.  Objectors' Motion in Limine to Exclude Settling Parties' Expert and Expert Report (Paper #92) is **DENIED**.

6.  Objectors' Motion to Disqualify Class Representative and Class Counsel (Paper #105) is **DENIED**.

7.  This action is **DISMISSED** with prejudice, and the Clerk is directed to mark the case **CLOSED.**

/s/ Norma L. Shapiro

_____

S.J.

.